# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

TRIMONT REAL ESTATE ADVISORS, INC.,
Suite 2200
Monarch Tower
3424 Peachtree Road, NE
Atlanta, GA 30326

      Plaintiff,

v.

CWCAPITAL ASSET MANAGEMENT LLC,
701 13th Street, NW
Suite 1000
Washington, DC 20005

      Defendant.

Civil Action No.

## COMPLAINT

Plaintiff TriMont Real Estate Advisors, Inc. ("TriMont") files this Complaint against Defendant CWCapital Asset Management LLC ("CWCapital") as follows:

### Preliminary Statement

1. This lawsuit arises out the failure of CWCapital to equitably allocate $19 million or more in fees that will be paid out of an approximately $3.925 billion sale of a portfolio of assets, including 666 hotel and other properties, that constituted security for a $4.1 billion loan. As described below, TriMont, a well-established, high-quality servicer of problem loans, was appointed to serve as a "special servicer" to manage the $4.1 billion loan made to affiliates of Extended Stay Hotels, Inc. ("Extended Stay") that was the subject of a collateralized mortgage-backed securitization, or "CMBS."

2. In general, CMBS transactions involve the pooling of commercial mortgage loans and transfer of those loans into a trust. The trust then issues certificates to investors and the

investors receive payments based on the payments made by the borrowers on the pooled loans. While the loans in a CMBS are not in default, they are managed by a "master servicer." If the loans in a CMBS go into default, however, the management of the problem loan is then transferred to a "special servicer," such as TriMont.

3. In this CMBS transaction, the $4.1 billion loan made to Extended Stay's affiliates was secured by mortgages on Extended Stay's hotel and other properties across the United States and Canada and was transferred into a trust. The Extended Stay loan became a problem loan on June 15, 2009, when Extended Stay and certain of its affiliates declared bankruptcy. The loan was transferred to TriMont as special servicer the next day, and from then until May 21, 2010, TriMont worked diligently to resolve the loan. TriMont's efforts were tremendously successful and resulted, among many other things, in the scheduling of an auction to begin on May 27, 2010, at which time the debtors' properties, including the properties securing the loan, would be put up for sale to the highest bidder with the proceeds of the sale of the properties securing the loan to benefit the investors. A few days before the auction was to be held, however, TriMont was replaced by CWCapital as special servicer. The auction went forward on May 27, 2010, ending early the next morning, and the highest bidder for the properties was a group led by Centerbridge Partners LP (collectively referred to as "Centerbridge"), which bid approximately $3.925 billion. When this transaction closes very soon, it will generate from the proceeds a "Liquidation Fee" payable to the special servicer. Upon information and belief, this fee will be $19 million or more.

4. Under the terms of the relevant CMBS trust agreement, TriMont is entitled to a share of that Liquidation Fee. The agreement states expressly that if TriMont is terminated "for any reason," TriMont "*will receive* a portion of the Liquidation Fee." The trust agreement

requires CWCapital and TriMont to "apportion the Liquidation Fee between themselves in a manner that reflects their relative contributions in earning the fee." Rather than apportioning the Liquidation Fee between itself and TriMont as required by the trust agreement, however, CWCapital has declared that it will keep all of the Liquidation Fee.

5. TriMont seeks relief from CWCapital's failure to comply with the terms of the trust agreement, including its failure to apportion the Liquidation Fee.

### Parties, Jurisdiction and Venue

6. TriMont is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business at Suite 2200, Monarch Tower, 3424 Peachtree Road, NE, Atlanta, Georgia 30326. Thus, for purposes of determining diversity of citizenship, TriMont is a citizen of the State of Georgia.

7. Upon information and belief, CWCapital is and at all relevant times was a limited liability company organized and existing under the laws of the State of Massachusetts and lists its principal place of business as One Charles River Place, 63 Kendrick Street, Needham, Massachusetts 02494. CWCapital is not a citizen of the State of Georgia for purposes of determining diversity of citizenship.

8. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9. This Court has personal jurisdiction over CWCapital because CWCapital transacts business and maintains a corporate office and a registered agent in this District. Specifically, upon information and belief, CWCapital's replacement of TriMont as special

servicer on the Extended Stay loan and CWCapital's actions as successor special servicer emanated from CWCapital's office in Washington, D.C.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2).

11. This action is filed within all applicable statutes of limitation and repose, and all conditions precedent have been performed or have occurred.

## Factual Allegations

### Creation of the Trust

12. Upon information and belief, Extended Stay was the largest owner and operator of mid-price extended stay hotels in the United States, holding a portfolio of over 680 hotels directly owned or leased by Extended Stay or one of its affiliates.

13. An investment consortium purchased this portfolio in June 2007 for approximately $8 billion. The consortium financed the purchase through loans in the aggregate amount of $7.4 billion, which consisted of: (i) a mortgage loan in the principal amount of $4.1 billion (the "Mortgage Loan" or "Mortgage Debt") secured by encumbrances on certain properties; and (ii) ten mezzanine loan tranches in an aggregate amount of $3.3 billion. This capital structure was designed to permit the securitization of the Mortgage Loan through a CMBS.

14. Twenty-one affiliates of Extended Stay were the borrowers (the "Mortgage Borrowers") under the Loan Agreement, dated as of June 11, 2007, evidencing the Mortgage Loan (as amended, the "Mortgage Loan Agreement").

15. Pursuant to the Mortgage Loan Agreement and certain other documents executed in connection therewith (the "Mortgage Loan Documents"), Wachovia Bank, National

Association, Bear Stearns Commercial Mortgage, Inc. and Bank of America, N.A. extended senior secured financing to the Mortgage Borrowers.

16. On August 1, 2007, Wachovia Large Loan, Inc., as Depositor, Wachovia Bank, National Association, as Servicer, and Wells Fargo Bank, N.A., as Trustee executed the relevant Trust and Servicing Agreement (the "TSA"). A true and correct copy of the TSA is attached hereto as Exhibit A.

17. § 11.12 of the TSA provides that the "Agreement shall inure to the benefit of and be binding upon . . . the Special Servicer and the Trustee and their respective permitted successors and assigns."

18. After the closing date of the Mortgage Loan Agreement, Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc. and Bank of America, N.A. sold and assigned their interests in the Mortgage Loan and the Mortgage Loan Documents to Wachovia Large Loan, Inc., which, in turn, deposited the Mortgage Loan and the Mortgage Loan Documents into the trust created under the TSA (the "Trust").

19. The Trust issued commercial mortgage pass-through certificates, and Wachovia Capital Markets, LLC, Bear, Stearns & Co. Inc., Banc of America Securities LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated were the initial purchasers of these certificates. Thereafter, various parties purchased the certificates from the initial purchasers.

20. The certificates issued by the Trust represented all of the beneficial interests in the assets held by the Trust. The rights of the holders of these certificates with respect to the Trust are governed by the TSA.

**TriMont's Appointment as Special Servicer**

21.     Under the terms of the TSA, the Servicer has responsibility for administering the Mortgage Loan as long as the Mortgage Loan is performing according to the terms of the Loan Documents, i.e., while the Mortgage Loan is not in default.

22.     If the Mortgage Loan goes into default, the TSA provides that the special servicer ("Special Servicer") has authority for servicing the Mortgage Loan. Thus, the Special Servicer is generally authorized to attempt to resolve the loan, such as through a loan modification and workout, or by foreclosure and sale of the real estate that serves as collateral for the Mortgage Loan.

23.     On June 15, 2009, Extended Stay and certain of its affiliates (collectively the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court of the Southern District of New York. There are 75 Debtors, including the 21 entities that are Mortgage Borrowers.

24.     Because the Debtors filed bankruptcy petitions, the Mortgage Loan went into default and the Mortgage Debt became a "Specially Serviced Loan" under the TSA.

25.     The Mortgage Loan was transferred to TriMont as Special Servicer on June 16, 2009, one day after the Extended Stay bankruptcy filings. (See Letter from Wachovia Securities to TriMont dated June 16, 2009, a true and correct copy of which is attached hereto as Exhibit B; Letter from Wachovia Bank, National Association, dated June 17, 2009, a true and correct copy of which is attached hereto as Exhibit C.) Before the Loan was actually transferred to TriMont as Special Servicer, TriMont had already been appointed Special Servicer under the TSA. On March 16, 2009, TriMont agreed to this appointment and specifically acknowledged that it was

bound by the TSA as Special Servicer. (See Agreement to Serve as Special Servicer dated March 16, 2009, a true and correct copy of which is attached hereto as Exhibit D.)

26. U.S. Bank National Association was appointed the successor trustee (the "Successor Trustee"), and was the owner and holder of the Mortgage Debt and the related note. As of the time the Extended Stay bankruptcy proceeding was commenced, the outstanding principal amount of the Mortgage Debt was approximately $4.1 billion.

**TriMont Provided Material Services in Connection with the Specially Serviced Loan**

27. TriMont was responsible for the servicing and administration relating to the resolution of the defaulted Mortgage Debt (except for other general servicing obligations performed by Wachovia Bank, National Association, the Successor Trustee, and/or Wachovia's successor by merger, Wells Fargo Bank, N.A.) and was authorized pursuant to the TSA to take action with respect to the Trust's rights and interests under the Mortgage Loan Documents.

28. TriMont performed material services in its role as Special Servicer pursuant to the "Accepted Servicing Standards," as defined in the TSA. The services provided by TriMont provided significant value and directly resulted in the ultimate favorable resolution of the Mortgage Loan.

29. The Debtors in the Extended Stay bankruptcy proceeding agreed to negotiate a consent order providing for an auction of the properties owned by Extended Stay, including the properties that were security for the Mortgage Loan, to help satisfy outstanding claims owed by the Debtors.

30. The auction of the properties owned by Extended Stay was scheduled to begin on May 27, 2010.

31. Centerbridge won the auction, which ended in the early morning hours on May 28, 2010, with its all-cash bid of approximately $3.925 billion.

32. Pursuant to the terms of the TSA, when the sale of the hotel and other properties securing the Mortgage Loan to Centerbridge is completed, the Special Servicer will be entitled under the TSA to be paid by the Trust a "Liquidation Fee." Upon information and belief, this fee will be $19 million or more.

**TriMont is Removed as Special Servicer**

33. Under the terms of the TSA, an "Operating Advisor," as that term is defined in the TSA, is authorized to replace the Special Servicer at any time, with or without cause.

34. On or about April 1, 2010, TriMont was advised that an Operating Advisor had been formed, comprised of three holders of the commercial pass-through certificates issued by the Trust: Cerberus Capital Management, UBS Securities, and Bank of America.

35. On May 17, 2010, the Operating Advisor gave notice of the removal of TriMont, without cause, as the Special Servicer, and the appointment of CWCapital as the successor Special Servicer, with such removal and appointment to be effective upon the receipt of certain rating agency confirmations and the assumption by CWCapital of the responsibilities, duties and liabilities of the Special Servicer under the TSA. A true and correct copy of the May 17 notice is attached hereto as Exhibit E.

36. As instructed in the May 17 letter, TriMont continued to discharge its duties as Special Servicer until May 21, 2010, when counsel for TriMont received confirmation of receipt by CWCapital of the required rating agency confirmations and an Acknowledgement of Proposed Special Servicer, dated May 21, 2010, pursuant to which CWCapital assumed all of the

responsibilities, duties and liabilities of the Special Servicer under the TSA. A true and correct copy of the Acknowledgement of Proposed Special Servicer is attached hereto as Exhibit F.

37. In the Acknowledgement of Proposed Special Servicer, CWCapital assumed the duties and liabilities of the Special Servicer under the TSA and acknowledged that it was a party to the TSA. The Acknowledgement specifically states: "[CWCapital] hereby assumes . . . all of the responsibilities, duties and liabilities of the Special Servicer under the [TSA] . . . [CWCapital] further acknowledges and agrees that . . . it is and shall be a party to the [TSA] and bound thereby to the full extent indicated therein in the capacity of Special Servicer with respect to [the Trust]."

38. On July 20, 2010, the bankruptcy court in the Extended Stay bankruptcy proceeding entered an Order Confirming Debtors' Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, which provided in relevant part:

> Notwithstanding anything to the contrary in the Plan or this Order, none of the rights or claims of TriMont Real Estate Advisors, Inc. under and pursuant to the [TSA], including without limitation, all rights or claims of TriMont with respect to compensation under the [TSA] relating to its portion of any 'Special Servicing Fees,' 'Work-Out Fee' or 'Liquidation Fee' (all as defined in the [TSA]) that is or becomes payable under the [TSA] shall be affected, discharged, released, exculpated or enjoined in any respect whatsoever by the Plan or this Order and all such rights and claims shall be expressly preserved and reserved.

(Confirmation Order, ¶ 39.) Thus, TriMont has expressly reserved the right to bring this action.

**Servicing Compensation Pursuant to the TSA**

39. TriMont has rights under and pursuant to the TSA, including, without limitation, all rights with respect to compensation relating to its portion of any "Liquidation Fee" (as defined in the TSA) that is or becomes payable under the TSA.

40. Under § 3.12 of the TSA, the Special Servicer is entitled to receive a Liquidation Fee if the Special Servicer receives liquidation proceeds with respect to any Mortgaged Property

on a sale or liquidation (including by way of full or discounted payoff) of the Mortgage Loan or Mortgaged Property.

41. § 3.12 of the TSA specifically states:

> If the Special Servicer resigns or is terminated for any reason, ***it will receive a portion of the Liquidation Fee*** that becomes payable with respect to [the Mortgage] Loan or related Foreclosed Property that was being administered by the Special Servicer at the time of such resignation or termination.

(Emphasis added.)

42. The same section of the TSA requires the terminated Special Servicer and the successor Special Servicer to apportion the Liquidation Fee between themselves as follows:

> The terminated Special Servicer and the successor special servicer shall apportion the Liquidation Fee between themselves in a manner that reflects their relative contributions in earning the fee.

43. The same section of the TSA provides:

> If the Special Servicer is terminated for any reason or resigns, it shall retain the right to receive . . . (iv) if the Mortgage Loan is then a Specially Serviced loan and the Special Servicer had performed material services in connection therewith prior to the resignation or termination, a pro rata portion (reasonably reflecting the relative contribution of the Special Servicer to the resolution) of . . . (y) any Liquidation Fee that subsequently arises if the Mortgage Loan does not become a Corrected Mortgage Loan. ***The successor Special Servicer will not be entitled to any portion of those . . . Liquidation Fees to which the Special Servicer is entitled.***

(Emphasis added.)

**CWCapital's Failure to Equitably Apportion the Liquidation Fee**

44. On June 9, 2010, TriMont provided written notice to, among others, CWCapital with respect to the payment and distribution of the Liquidation Fee. (*See* Letter from TriMont to CWCapital dated June 9, 2010, a true and correct copy of which is attached hereto as Exhibit G.)

45. In the June 9 letter, TriMont stated that it was "ready, willing and able to discuss the apportionment of any such fees with [CWCapital]."

46.   To date, CWCapital has not responded in writing to the June 9 letter.

47.   On or about August 12, 2010, CWCapital's counsel verbally conveyed to TriMont's counsel that CWCapital is taking the position that TriMont is not entitled to receive any portion of the Liquidation Fee.

48.   On September 16, 2010, TriMont provided a second written notice to, among others, CWCapital with respect to the payment and distribution of the Liquidation Fee. A true and correct copy of this notice is attached hereto as Exhibit H.

49.   CWCapital failed to respond to the September 16, 2010 letter.

## Count I: Declaratory Judgment

50.   TriMont repeats and incorporates herein by reference each of the allegations set forth above.

51.   TriMont and CWCapital were parties to the TSA, as shown by § 11.12 of the TSA, TriMont's March 16, 2009 Agreement to Serve as Special Servicer, and the May 21, 2010 Acknowledgement of Proposed Special Servicer. The TSA is a valid, binding and enforceable contract.

52.   TriMont has fully performed all the conditions, covenants, and promises it was required to perform in accordance with the terms and conditions of the TSA.

53.   Under the terms of the TSA, TriMont is entitled to that portion of the Liquidation Fee that reasonably reflects its contribution in earning the fee. TriMont is entitled to at least $11.5 million of the Liquidation Fee.

54.   CWCapital has refused to comply with the TSA's requirement that CWCapital equitably apportion the Liquidation Fee and has stated that TriMont is not entitled to any portion of the Liquidation Fee.

55. An actual controversy exists between TriMont and CWCapital concerning the amount of the Liquidation Fee to which TriMont is entitled under the TSA.

56. TriMont, therefore, seeks a declaration of the relative apportionment of the Liquidation Fee to which TriMont and CWCapital are entitled under the TSA.

57. Such declaratory relief will settle the controversy between the parties.

### Count II: Breach of Contract

58. TriMont repeats and incorporates herein by reference each of the allegations set forth above.

59. TriMont and CWCapital were parties to the TSA, as shown by § 11.12 of the TSA, TriMont's March 16, 2009 Agreement to Serve as Special Servicer, and the May 21, 2010 Acknowledgement of Proposed Special Servicer. The TSA is a valid, binding and enforceable contract.

60. TriMont has fully performed all the conditions, covenants, and promises it was required to perform in accordance with the terms and conditions of the TSA.

61. CWCapital has breached the TSA by refusing to apportion the Liquidation Fee in a manner reflecting TriMont's relative contribution in earning the fee and by asserting that CWCapital is entitled to portions of the Liquidation Fee to which TriMont is entitled.

62. As a direct and proximate result of CWCapital's breach, TriMont has suffered, and will suffer, damages in an amount to be determined at trial. TriMont is entitled to at least $11.5 million of the Liquidation Fee.

### Count III: Breach of the Covenant of Good Faith and Fair Dealing

63. TriMont repeats and incorporates herein by reference each of the allegations set forth above.

64. TriMont and CWCapital were parties to the TSA, as shown by § 11.12 of the TSA, TriMont's March 16, 2009 Agreement to Serve as Special Servicer, and the May 21, 2010 Acknowledgement of Proposed Special Servicer. The TSA is a valid, binding and enforceable contract.

65. TriMont has fully performed all the conditions, covenants, and promises it was required to perform in accordance with the terms and conditions of the TSA.

66. An implied covenant of good faith and fair dealing existed in the TSA with respect to TriMont and CWCapital. This implied covenant required that CWCapital cooperate with TriMont under the TSA and not do anything which would have the effect of destroying or injuring TriMont's right to receive the fruits of the TSA.

67. CWCapital has breached the implied covenant of good faith and fair dealing by refusing to equitably and reasonably apportion the Liquidation Fee owed under the TSA in a manner reflecting the parties' relative contributions in earning the fee. TriMont is entitled to at least $11.5 million of the Liquidation Fee.

68. As a direct and proximate result of CWCapital's breach of the implied covenant, TriMont has suffered, and will suffer, damages in an amount to be determined at trial.

### **Prayer for Relief**

WHEREFORE, having stated its Complaint, TriMont requests:

(a) that this Court, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, take jurisdiction over this matter and issue a declaratory judgment which declares the relative percentages of the Liquidation Fee to which TriMont and CWCapital are entitled under the TSA;

(b) that judgment be entered in favor of TriMont and against CWCapital in an amount to be determined at trial, not less than $11.5 million, together with all accrued and accruing interest, costs, expenses, and fees;

(c) that the Court award TriMont all reasonable attorney's fees and costs for bringing this action; and

(d) that the Court award such other and further relief as the Court may deem just and appropriate.

### Jury Demand

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, TriMont hereby demands a trial by jury as to all issues so triable.

This 21st day of September, 2010.

Respectfully submitted,

_____
Lora A. Brzezynski
D.C. Bar # 444261
MCKENNA LONG & ALDRIDGE LLP
1900 K Street NW
Washington, DC 20006
202.496.7500
202.496.7756 (fax)

OF COUNSEL:

David L. Balser
Georgia State Bar # 035835
Lawrence A. Slovensky
Georgia State Bar # 653005
J. Patton Dycus
Georgia State Bar # 236636
MCKENNA LONG & ALDRIDGE LLP
303 Peachtree Street NW Suite 5300
Atlanta, GA 30308
404.527.4000
904.527.4198 (fax)

*Attorneys for the Plaintiff*